UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X
                                                              :
UNITED STATES OF AMERICA                                      :
                                                              :           S6 11 Cr. 337 (PKC)
        - v. -                                                :
                                                              :
THOMAS HOEY, JR.,                                             :
                                                              :
                        Defendant.                            :
                                                              :
------------------------------------------------------------------------------X

## <u>THE GOVERNMENT'S SENTENCING SUBMISSION</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Margaret Garnett
Ian McGinley
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X
                                :

UNITED STATES OF AMERICA         :

                               :          S6 11 Cr. 337 (PKC)

          - v. -                 :

                               :

THOMAS HOEY, JR.,           :

                               :

                 Defendant.     :

                               :

-------------------------------------------------------------------------------X

## THE GOVERNMENT'S SENTENCING SUBMISSION

The Government respectfully submits this memorandum in connection with the defendant's sentencing, scheduled for April 23, 2015. As discussed below, the correct advisory sentencing range under the United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G") is 121 to 151 months' imprisonment, which is the Guidelines range agreed to by the parties in the plea agreement. While using a different Guidelines calculation, the United States Probation Office in its Presentence Report ("PSR") recommends an above guidelines sentence of 20 years' imprisonment, the statutory maximum for the defendant's crimes.

Thomas Hoey, Jr., the defendant, led a large scale cocaine distribution conspiracy for over five years, which lead to the death of Kim Calo and hurt the lives of many others. He has no respect for the law or regard for other people, as evidenced by his preventing Ms. Calo from getting medical help as she lay dying in his hotel room from the cocaine he provided her, and his egregious efforts to cover up his crimes and obstruct justice. Given the seriousness of the defendant's offenses, his flagrant and repeated disregard for the law, and the strong need for specific and general deterrence, the Government submits that a prison term above the Guidelines range of 121 to 151 months' imprisonment is warranted under the factors set forth in Title 18, United States Code, Section, 3553(a).

# BACKGROUND

**A.     The Indictment and Change of Plea Hearing**

On August 14, 2014, a three count criminal information (the "Information") was filed against the defendant.  Count One charged the defendant with conspiring to distribute and possess with the intent to distribute cocaine, from in or about 2005, up through and including in or about 2010, in violation of Title 21, United States Code, Section 841(b)(1)(C), and Title 18, United States Code, Section 371.  Count Two charged the defendant with conspiring to suborn perjury from at least in or about January 2011, up to and including in or about May 2011, in violation of Title 18, United States Code, Sections 371 and 1622.  Count Three charged the defendant with obstruction of justice, and aiding and abetting the same, from on or about January 10, 2009, up to and including in or about May 2011, in violation of Title 18, United States Code, Sections 1503 and 2.

On August 14, 2014, the defendant pled guilty to the three counts in the Information.  As part of the defendant's plea allocution, he admitted the following:

| | |
|---|---|
| Defendant: | For Count One, your Honor, between approximately 2005 and 2010 I entered into an agreement with others to distribute cocaine to other people for their personal use.  This occurred during social settings and not exchanged for money.  This conduct took place mainly in Manhattan and on Long Island.  Among the people I shared cocaine with was a woman named Kim Calo on January 10, 2009. |
| The Court: | When you say, "shared cocaine," you mean gave cocaine to? |
| Defendant: | Yes |
| The Court: | You gave her cocaine on January 10, 2009? |
| Defendant: | Yes, your Honor. |
| The Court: | With regard to Court Two? |
| Defendant: | Count Two, in the spring of 2011 I agreed with others to attempt to get Nichole (sic) Zobkiw to give material false testimony to a grand jury in |

|  |  |
|---|---|
| | the Southern District of New York that was investigating the overdose death of Kim Calo. |
| The Court: | And with regard to Count Three? |
| Defendant: | In 2011 I endeavored to obstruct the federal grand jury investigation in Southern District of New York into the cocaine overdose death of Kim Calo. I did so for an improper purpose, to prevent criminal charges from being brought against me. |
| The Court: | Now, with regard to Count One, do you agree that the amount of cocaine distributed was at least three and half kilograms but less than five kilograms of cocaine? |
| Defendant: | Yeah, I guess so. Yeah. |
| The Court: | Mr. Hoey, did you know what you were doing as to each of these counts was wrong and unlawful? |
| Defendant: | I do, your Honor. |

Sentencing Tr. 8/14/2015, at 19-21.

**B.    Offense Conduct**

1.    <u>The Defendant's Cocaine Distribution and the Death of Kim Calo</u>

In the early morning hours of January 10, 2009, Kim Calo and Nicole Zobkiw arrived at the Kitano Hotel in Manhattan to meet the defendant, at his invitation. (PSR ¶ 12). Ms. Zobkiw had a pre-existing sexual relationship with the defendant that had gone on for years, and mainly involved the two having sex and using cocaine provided by the defendant. (PSR ¶ 11).

After Ms. Calo and Ms. Zobkiw arrived at the Hotel, they went to a suite that had been rented by the defendant. (PSR ¶ 13). The defendant offered both women cocaine and both women used the cocaine that Hoey offered to them. (*Id*.). The defendant then had sexual relations with both women. (*Id*.). After the defendant and Ms. Calo had sex, the defendant offered Ms. Calo more cocaine, which had been spread out on the coffee table of the hotel suite.

(*Id*.).  Almost immediately after using the cocaine that had again been provided to her by the defendant, she began convulsing, shaking, and foaming at the mouth.  (*Id*.).

Ms. Zobkiw wanted to call an ambulance for Ms. Calo, but the defendant said no and refused to allow Ms. Zobkiw to use the phone in the hotel room.  (PSR ¶ 14).  Ms. Zobkiw went to the hotel's front desk multiple times and asked the hotel to call an ambulance for Ms. Calo.  (*Id*.).  The hotel staff instead called the defendant, who again refused to call an ambulance, insisting to the hotel staff that everything was fine.  (*Id*.).  When the hotel staff went to the hotel room, the defendant stopped the staff at the door, still insisting that Ms. Calo was fine.  (PSR ¶ 15).

Instead of calling an ambulance, the defendant called a "doctor friend" of his, Debra King, to come to the hotel.[1]  (PSR ¶ 17).  While waiting for Ms. King to arrive, the defendant tried to re-dress Ms. Calo, presumably in order to cover up the intimate nature of their contact that evening.  Ms. Calo eventually did receive medical attention and was declared dead; the medical examiner later determined that her death had been caused by the combined effects of cocaine use and alcohol.  (*Id*.).

Before the police or emergency services arrived, the defendant enlisted his driver, co-defendant Alejandro Noriega, to remove the cocaine and all evidence of cocaine use from the hotel room, instructing him to transfer the black bag containing the evidence to a different limousine back on Long Island.  The police eventually recovered a similar bag, cocaine, items belonging to the defendant, and other drug and sexual paraphernalia from the defendant's limousines and Mr. Noriega's apartment.

---

[1] Ms. King is a physician's assistant, not a medical doctor.  She is a former paramour of the defendant's.

Both the defendant and Ms. Zobkiw were interviewed that morning by officers from the New York City Police Department ("NYPD"). Ms. Zobkiw gave a full and truthful statement about what happened in the hotel room. (PSR ¶ 18). The defendant lied to police, denying that he supplied Ms. Calo and Ms. Zobkiw with cocaine.

Both before and after Ms. Calo's death, the defendant regularly provided significant quantities of cocaine to a wide variety of social acquaintances, many of whom were women that he also had sexual relations with. While many of the people the defendant supplied with cocaine had used the drug before and were fully-consenting adults, others were young (in at least one case, high-school-aged), or had never used cocaine before meeting the defendant.

In April 2007, during the timeframe of the drug conspiracy charged in Count One, the defendant was arrested by the NYPD in Manhattan. Inside the defendant's limousine, police recovered over 2 ounces cocaine, 2 bags of marijuana, and a scale. The defendant also had approximately $44,000 in cash.

2.      Ms. Zobkiw's False Grand Jury Testimony

On several occasions in 2009 and 2010, Ms. Zobkiw voluntarily met with DEA agents investigating the defendant; in those meetings, she provided substantially the same information about the defendant and about Ms. Calo's death that she had provided to the police in January 2009. Throughout this period, the defendant periodically importuned Ms. Zobkiw not to talk to law enforcement, implicitly threatening her by referencing stories he had told her previously about his alleged Mafia connections and telling her, in substance, that he could make the events of Ms. Calo's death look like Ms. Zobkiw's fault and that if she implicated him, she would be the one "in trouble." In early 2011, Ms. Zobkiw was served with a federal grand jury subpoena to give testimony before a grand jury in the Southern District of New York investigating Ms.

Calo's death.  (PSR ¶ 21).  Ms. Zobkiw informed the defendant of the grand jury subpoena and asked him to provide her with a lawyer.  The lawyer that was provided to her by the defendant was Barry Balaban.  Ms. Zobkiw first met with Mr. Balaban in her home shortly before her scheduled grand jury testimony.  She met with him again on April 5, 2011, the night before her scheduled grand jury testimony.  Without the knowledge of Ms. Zobkiw or Mr. Balaban, Ms. Zobkiw's then-boyfriend surreptitiously recorded the April 5 meeting between Ms. Zobkiw and Mr. Balaban.  That recording was later provided to the Government, with Ms. Zobkiw's consent and permission.  The recording reveals Balaban explicitly coaching Ms. Zobkiw to give perjurious testimony to the grand jury, and repeatedly referencing, in substance, that he is there at the defendant's request and is interested in doing what is best for both Ms. Zobkiw and the defendant.  (*See* PSR ¶ 31).

On April 6, 2011, Ms. Zobkiw testified before a federal grand jury in the Southern District of New York.  (*See* PSR ¶ 27).  She was accompanied to the courthouse by Balaban, acting as her lawyer.   That testimony was substantially different in numerous material respects from Ms. Zobkiw's prior statements to law enforcement and materially inconsistent with other evidence revealed by the criminal investigation into Calo's death.  (*Id.*).  In general, Zobkiw's false testimony tended to absolve the defendant of responsibility for Calo's death.  (*Id.*).

3.      The Defendant Pressures Ms. Zobkiw to Sign a False Statement at an Abandoned Warehouse in Long Island

As referenced in Count Three of the Information, approximately one month after her perjurious grand jury testimony, on or about May 5, 2011, in the evening,  Ms. Zobkiw was brought by the defendant, under false pretenses, to an empty warehouse formerly used by the defendant's company.  Waiting in an office space inside the vacant warehouse were the defendant's sister, Yolanda Hoey, Balaban, and Deirdre Johnson, a private investigator working

for the defendant.  At the defendant's direction, Ms. Zobkiw was presented with a document that essentially restated her perjurious grand jury testimony and was asked to sign it.  The plan was to send this document to the United States Attorney's Office for the Southern District of New York, in an attempt to prevent criminal charges from being brought against the defendant by further bolstering Ms. Zobkiw's perjurious grand jury testimony.  Ms. Zobkiw initially refused to sign.  But she was kept in the warehouse office for over an hour, as the defendant initially waited in the hallway outside the office and then eventually left Ms. Zobkiw there, without transportation, as she was urged and pressured by the defendant's employees and associates to sign the statement.  Eventually Ms. Zobkiw did sign the statement, and then was driven back to her car, which she had parked some miles away at the active warehouse of the defendant's company in Long Island.

B.     **The Defendant's Criminal History**

The defendant has one previous conviction.  In or about May 2014, in New York State Supreme Court, New York County, the defendant was convicted after a jury trial of assault in the third degree, a class A misdemeanor, in violation of New York Penal Law § 120.00[2], and of tampering with physical evidence, a class E felony, in violation of New York Penal Law § 215.40[2].  On February 27, 2015, the defendant was sentenced to concurrent terms of 1 and 1/3 to 4 years' imprisonment (the "State Conviction").  This conviction stemmed from the defendant's brutal assault on his girlfriend, Allison Bretherick.  (PSR ¶ 53).  Specifically, on or about March 30, 2012, one of Ms. Bretherick's neighbors in Manhattan called 911, after witnessing the defendant and Ms. Bretherick arguing in a stairwell of the apartment building, and observing that Ms. Bretherick was bleeding heavily and had bruises on her face.  (*Id.*).  The witness also observed the defendant attempting to remove the blood evidence of the assault before the police arrived.  Officers from the NYPD responded to the scene and confirmed that Ms. Bretherick was bleeding and had bruises on her face.  (*Id.*).  The defendant appeared

intoxicated at the time, and Ms. Bretherick refused to cooperate with law enforcement, both at the scene and during the entire course of the case. (*See Id.*).

**C.     Statutory Maximum Terms of Imprisonment and the Applicable Guidelines Range**

Counts One and Two each carry a maximum term of 5 years' imprisonment. (PSR ¶ 75). Count Three carries a maximum term of 10 years' imprisonment. (*Id.*). Thus, the defendant faces a total maximum term of 20 years' imprisonment.

1.     Plea Agreement

Under the parties' plea agreement, the three counts in the Information were divided into two groups. The first group, Group A, consisted of Count One, conspiracy to distribute and possess with intent to distribute cocaine, with a base offense level of 30,[2] because the offense involved at least 3.5 kilograms but less than 5 kilograms of cocaine. *See* U.S.S.G. § 2D1.1(c)(7).

The second group, Group B, consisted of Counts Two and Three (the "obstruction counts"), because these counts involved substantially the same harm and were part of a common scheme or plan. *See* U.S.S.G. § 3D1.2. With a base offense level of 30, *see* U.S.S.G. § X3.1(a), plus a two level increase for being an organizer or leader, *see* U.S.S.G. § 3B1.1, the base offense level for Group B was 32.

Under the Guidelines applicable to multiple groups of conviction, the combined offense level for Groups A and B was 34. U.S.S.G. § 3D1.4. With acceptance of responsibility, the applicable Guidelines offense level was 31.

At the time the parties entered into the plea agreement, the defendant had been convicted, but not yet sentenced, for his State Conviction. Accordingly, the parties agreed that if the defendant received a sentence of 60 days' imprisonment or more for the State Conviction, the

---

[2] Because of amendments to the Guidelines scheduled to take effect in November 2014, and which have since taken effect, the parties acknowledged in the plea agreement that the defendant should be sentenced as if the offense level from Count One were 28 rather than 30.

defendant would be in Criminal History Category II, with a resulting Stipulated Guidelines range of 121 to 151 months' imprisonment. Otherwise, the defendant would be in Criminal History Category I, with a Stipulated Guidelines range of 108 to 135 months' imprisonment. Because the defendant in fact received a sentence of more than 60 days' imprisonment for the State Conviction, the Stipulated Guidelines Range under the plea agreement was 121 to 151 months' imprisonment.

       2.     <u>Probation Office's Guideline Calculation</u>

The Probation Office performed a different Guidelines calculation. The Probation Office grouped all three counts in the Information together, under U.S.S.G. § 3D1.2(c), which provides that counts are grouped when one of the counts embodies conduct that is treated as a specific offense characteristic, or an adjustment to, the guideline applicable to another of the counts. (PSR ¶ 39). The Probation Office found that the base offense level for the grouped counts was 28,[3] which corresponded to the offense level for Count One, the highest offense level of the three counts.[4] (PSR ¶ 40). The Probation Office increased this offense level by two points, because the defendant was an organizer or leader. (PSR ¶ 43). The Probation Office increased the offense level by an additional two points, because the defendant impeded and obstructed the administration of justice with respect to the investigation, leading to an adjusted offense level of 32. (PSR ¶ 44-45). With acceptance of responsibility, the Probation Offense found the total offense level to be 29, with a resulting Guidelines range of 97 to 121 months' imprisonment.

---

[3] At the time the PSR was issued, the Guidelines for narcotics offenses had been amended and the offense level for Count One was lowered from 30 to 28, as anticipated in the plea agreement.

[4] In fact, the offense level for Counts Two and Three is higher (level 30), although if the calculation began with Level 30, no enhancement for obstruction would apply and, in effect, the narcotics conduct in Count One would simply fall away and not increase the offense level at all, under this calculation method.

3.      Applicable Guidelines Range

Upon further review of Application Note 5 to U.S.S.G. § 3D1.2(c), the Government

agrees with the Probation Office that at least one of the obstruction counts should be grouped

with Count One, rather than having the two obstruction counts grouped as Group B, as calculated

in the plea agreement.[5]  Nevertheless, as detailed below, we believe that the final Guidelines

range reflected in the plea agreement (accounting for the defendant's state sentence of more than

60 days' imprisonment) is correct.

The Government believes that the correct Guidelines range should be calculated as

follows.  Where, as here, a defendant is convicted of both an obstruction offense (Count Two or

Count Three) and of an underlying offense (Count One), "the count for the obstruction offense

will be grouped with the count for the underlying offense . . . ."  U.S.S.G. § 3C1.1, cmt. n.8; *see

also* U.S.S.G. § 3D1.2, cmt. n.5.  From there, the Guidelines direct that "[t]he offense level for

that group of closely related counts will be the offense level for the underlying offense increased

by the 2-level adjustment specified by this section, or the offense level for the obstruction

offense, whichever is greater."  *Id.*

In other words, as courts have noted, "when a defendant is convicted of both an

obstruction of justice offense and the underlying offense, the Guidelines group the two counts

and either apply a two-level enhancement to the underlying offense or apply the offense level for

the obstruction conviction, but never both."  *See United States* v. *Jones*, 716 F.3d 851, 858 (4th

Cir. 2013).  This grouping serves two purposes: "(1) obviating a factual finding of obstruction of

justice at sentencing when the trier of fact has already reached such a finding at the guilt phase;

_____

[5] Following receipt of the PSR, the parties discussed the different grouping methodology that
Probation had applied in the PSR, and agreed that neither party would consider it a breach of the
plea agreement if, in response to the calculation in the PSR, the Government advanced the
Guidelines argument contained herein, and the defendant urged adoption of the Guidelines
calculation contained in the PSR.

and (2) preventing the double counting that would occur if a district court applied both a base offense level to the obstruction conviction and a two-level obstruction enhancement to the underlying offense." *Id.* (internal citation and quotations omitted). Relying on this commentary to U.S.S.G. §§ 3C1.1 and 3D1.2, the Probation Office found that the overall offense level was 32, with the offense level for the underlying narcotics offense increased by the two-level obstruction adjustment and the two-level organizer adjustment.[6]

However, where, as here, there are multiple obstruction convictions to group (a conspiracy to suborn perjury count and an obstruction of justice count), the Guidelines provide that:

> Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor. In such cases, only the count representing the most serious of those factors is to be grouped with the other count.

U.S.S.G. § 3D1.2, application note 5.

In this case, there are two obstruction of justice counts, namely Count Two and Count Three. Only one of these counts should be grouped with Count One. *See Jones*, 716 F.3d at 859 (noting that where a defendant was convicted of two witness tampering counts directed towards the same underlying offense or investigation, each of which alone could have supported a two-level enhancement, the "Sentencing Guidelines permit only one obstruction of justice enhancement under U.S.S.G. § 3D1.1," because "U.S.S.G. § 3D1.2 Application Note 5 directs the district court to group only the count representing the most serious obstructive conduct" (internal quotations and citations omitted); *see also United States v. Beckner*, 983 F.2d 1380,

---

[6] That offense level is the same as the offense level for the obstruction offenses alone in the plea agreement, which is also 32 (base level of 30, increased by the two-level organizer/leader enhancement).

1385 (6th Cir. 1993) (grouping only one of two "resisting arrest" counts with underlying offense pursuant to Application Note 5).  Accordingly, in *Jones*, the court concluded that:

> [the defendant's] insistence that the district court should have grouped both obstruction convictions with the underlying offense overlooks (1) U.S.S.G. § 3C1.1 Application Note 8, which provides that the grouping of obstruction of justice convictions should occur pursuant to U.S.S.G. § 3D1.2(c); and (2) U.S.S.G. § 3D1.2 Application Note 5, which requires a district court to group only the "most serious" of the obstruction convictions.

716 F.3d at 859.

Here, the most serious obstruction count is arguably Count Two, because it involved perjury before a federal grand jury.[7]  Thus, Count Two should be grouped with Count One, producing a grouped offense level of 32.  But Count Three remains its own group, with an overall offense level of 32.  Accordingly, under the rules for determining the overall offense level for multiple groups, *see* U.S.S.G. § 3D1.4, there are two "units," which results in a two-level increase in the highest group's offense level, resulting in a total combined offense level of 34, less three levels for acceptance of responsibility, which yields a final offense level of 31.  At Criminal History Category II, the applicable Guidelines range remains 121 to 151 months' imprisonment.[8]

---

[7] The decision as to which of two obstruction counts is "most serious" is of no practical consequence in this case, as either count alone would produce the same offense level – 30 plus 2 for organizer/leader.

[8] Even if the Court were to adopt the Guidelines calculation in the PSR, the Government respectfully submits that, under Section 3553(a), as discussed further below, and taking into account the policy goals set out in Application Note 5, the Court should impose a higher sentence than 108-135 months, because that application of the Guidelines does not sufficiently account for the seriousness of the defendant's obstructive conduct.

# DISCUSSION

## A.     Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.     An Above-Guidelines Sentence is Appropriate**

As discussed below, the application of the factors under Section 3553(a) warrants a sentence above the Guidelines range of 121 to 151 months.

1.     Seriousness of the Offenses

The defendant's crimes are serious and demonstrate his extreme disregard for other peoples' lives in order to benefit himself, and his complete lack of respect for the legal and judicial system.

The defendant led a large scale cocaine distribution conspiracy for over five years, regularly providing cocaine for personal use to a range of social and sexual acquaintances. Many of the recipients of the defendant's "largesse" with cocaine shared similar characteristics – they were vulnerable, experiencing difficulties in their lives, and initially inexperienced in using cocaine. The defendant preyed on these vulnerabilities and exploited them for his own ends, which often included sex and other favors in explicit or implicit exchange for his cocaine. For example, some of the women that the defendant provided with cocaine and other drugs over the years included (i) the teenage babysitter of his younger child (a relationship that continued for years and eventually included providing cocaine and alcohol to her then-college-age but still underage friends);  (ii) a woman in the midst of an acrimonious divorce, struggling to support her young son, for whom Hoey secured an apartment, paid the rent, and then pressured the woman to allow him to store kilograms of cocaine and large amounts of cash in the walls of that apartment so that he did not have to risk transporting those items between Manhattan and Long Island; (iii)  other women in precarious financial circumstances, working as bartenders or waitresses, to

whom Hoey initially showed financial generosity and then used that perceived position to pressure them for sexual favors (which at times included sex with other men while he watched, or procuring other women for him to have sex with). As he did with Nicole Zobkiw, the defendant led many of these women to believe that he had connections to the Mafia or organized crime, and used implicit or explicit threats against them or their families if they ever crossed him, such as by exposing his narcotics distribution to the police, or ending the relationship with him against his wishes.

As part of this narcotics conspiracy, in the early morning hours of January 10, 2009, the defendant provided cocaine to Ms. Calo that led to her death. The medical examiner concluded that Calo died from "acute intoxication due to the combined effects of cocaine and alcohol." In its discussions with the medical examiner, the Government learned that "acute intoxication" means intoxication of an abrupt onset, caused by something akin to an allergic reaction that some people have from ingesting cocaine along with alcohol. It is not caused by alcohol alone, but rather by the way that cocaine can interact with alcohol in the bloodstream, and thus cocaine is the but-for cause of death under these circumstances. It is also clear that Ms. Calo did not overdose from the cumulative effects of cocaine ingested over the period of the night.[9] Rather, she died from the almost instantaneous reaction of the cocaine and alcohol she ingested shortly before her death. Given that it is undisputed that Ms. Calo began convulsing immediately after ingesting cocaine provided by the defendant at the hotel, it cannot be seriously disputed that Ms. Calo died as a result of the cocaine the defendant provided to her.

---

[9] To be clear, the Government does not believe that Ms. Calo ingested cocaine the night of her death before she arrived at the Kitano Hotel, or at least not for hours beforehand. Ms. Zobkiw was with Ms. Calo on Long Island and for the long car ride into Manhattan and did not observe her use any drugs or appear to be under the influence of any drugs. Moreover, the suggestion that, once in the hotel room, Ms. Calo would have used her own small quantity of cocaine while Hoey's free, high-quality cocaine was spread out on the coffee table for her to use, defies common sense.

The defendant's conduct after providing Ms. Calo this lethal dose of cocaine was unquestionably egregious. The defendant callously watched as Ms. Calo convulsed, foamed at the mouth, turned blue, and died in front of him. As this was happening, the defendant thought of only one person – himself. His sole focus was to try to keep himself out of trouble, rather than trying to help a dying woman. To that end, he prevented Ms. Zobkiw and the hotel staff from getting help. Instead, the defendant called a former girlfriend of his, a physician's assistant, to evaluate Ms. Calo. It was not until hours had passed and the physician's assistant declared Ms. Calo dead that Ms. Calo got the medical attention she deserved.[10]

The defendant's incorrigible selfishness did not stop when he refused to help Ms. Calo as she lay dying. Beginning that day and continuing over the next two years, the defendant went to extraordinary lengths to obstruct the state and federal investigations into Ms. Calo's death. He first enlisted his driver, a low-paid employee beholden to the defendant in various ways, to remove all evidence of cocaine use from the hotel room and secret it in places less likely to be connected to the events in that hotel room. When he was interviewed by the NYPD on the morning of Ms. Calo's death, the defendant lied and said he never gave cocaine to either Ms. Calo or Ms. Zobkiw. He repeatedly importuned Ms. Zobkiw not to tell the truth to law enforcement about the events of that night. The defendant then hired Barry Balaban to pressure Ms. Zobkiw to lie before a federal grand jury, leading to her being convicted of a felony. Even after that egregious perjury scheme, the defendant orchestrated the inveigling of Ms. Zobkiw to

_____

[10] From talking to the medical examiner, the Government understands that the bio-chemical reaction that caused Ms. Calo's death began almost immediately and that, in all likelihood, even very prompt medical attention could not have saved her life. However, that does not make the defendant's conduct any less abhorrent, because the defendant could not have known these medical facts, and indeed his feeble actions regarding Ms. Calo's condition (laying her down, trying to give her milk procured by Mr. Noriega and Ms. Zobkiw, calling Ms. King) suggest that he believed that it was possible to save her, and yet he deliberately obstructed the most obvious means of saving her life – calling an ambulance.

an abandoned warehouse, where for over an hour she was coaxed and pressured, while not feeling free to leave, to sign a statement that was to be submitted to the U.S. Attorney's Office containing various false statements about Ms. Calo's death, in an attempt to prevent the Government from charging the defendant or pursuing its investigation further.

Even in this very case, the defendant has made misleading statements to the Court, when it serves his interest. For example, when the defendant was petitioning the Court to be released on bail pending trial, the defendant portrayed himself as a traditional married family man, even submitting a letter from his purported wife in support of his petition. (*See* Doc. 84, p. 13; Doc. 90). However, the Presentence Report notes that the defendant told the Probation Office that he and his wife separated five years ago, that his wife is in a new relationship, and that the defendant had been living with his girlfriend, Allison Bretherick, for some time prior to his arrest. (PSR ¶ 57).

All of these actions speak of a man with no respect for the legal system, who believes that because of his power and wealth he does not have to play by the rules or tell the truth.

In sum, the defendant's drug distribution and subsequent obstruction scheme destroyed numerous lives, and the defendant has shown no concern for anyone but himself. Ms. Calo died from ingesting the cocaine the defendant provided her. Ms. Zobkiw lied for the defendant, was convicted of perjury, and has since died from a drug overdose. Both of these women have children and families that have been gravely impacted as well by the defendant's actions. Although undoubtedly less sympathetic, the defendant's former limousine driver now also has a felony conviction and served a brief jail term, and Mr. Balaban is serving 48 months in prison --- all as a result of the defendant's efforts to avoid any consequence for himself from his conduct.

2.      <u>The Need for the Sentence to Serve as a Deterrent and to Promote Respect for the Law</u>

The defendant learned nothing from the tragic death of Ms. Calo.  After her death, the defendant continued to distribute cocaine socially for at least another year, knowing full well that another person could have overdosed on his cocaine.  Indeed, the defendant expressed his view to one girlfriend that the difficult thing for him about Ms. Calo's death was that "it could have been you, [girlfriend]," during an interlude that included the defendant providing this girlfriend with cocaine.  That the defendant would continue to put other peoples' lives at risk, even after Ms. Calo's death, shows not only that he lacks remorse, but that there is an extreme risk he will again distribute cocaine, and is worthy of a strong sentence to deter him from doing so.

The defendant also engaged in long-term and varied efforts to obstruct justice.  The defendant hired a corrupt lawyer to coach Ms. Zobkiw to lie before a federal grand jury.  The defendant forced Ms. Zobkiw to sign a false statement to submit to the U.S. Attorney's Office.  These were not isolated incidents or momentary lapses of judgment.  Rather, the defendant engaged in a coordinated and calculated effort to obstruct justice.

The defendant's efforts to obstruct justice even continued after this case.  Not long after hiring Barry Balaban and pressuring Ms. Zobkiw to lie before a Federal grand jury, the defendant assaulted his girlfriend, Allison Bretherick, leaving her bloody and bruised.  The defendant then tried to cover up this crime, just as he attempted to do in this case.   The defendant was convicted of evidence tampering, a felony, in connection with his efforts to cover up the assault on Allison Bretherick.  Moreover, it is apparent from a review of the defendant's authorized calls from Rikers Island (where he was held for the last several months pending his state sentencing) that the defendant engaged in machinations to have unrecorded or untraceable

phone conversations with Ms. Bretherick and others, either by illegally purchasing the PIN numbers of other inmates to use or by use of a contraband cellphone.

In sum, the defendant is a recidivist, with no respect for the law, who conducts himself in the world with a shocking recklessness, and consistently puts his own interests above the law, and anyone that gets in his way. A significant sentence is therefore needed to deter the defendant from engaging in future crimes.

A significant sentence is also needed to deter others from engaging in similar offenses. Detecting, investigating and prosecuting perjury and obstruction crimes is notoriously difficult. Prosecuting such defendants requires significant government resources and, even with those resources, some good fortune. In this case, if Ms. Zobkiw's then-boyfriend had not surreptitiously recorded Barry Balaban, the Government may not have been able to charge the defendant for his extensive and egregious efforts to obstruct justice. A substantial sentence is therefore necessary here to counterbalance the lower risk of apprehension, and to demonstrate to others that the commission of these types of crimes that corrupt the justice system will result in significant penalties.

### 3.     The History and Characteristics of the Defendant

As noted in the PSR, the defendant has a close family and the defendant was born into the family banana business, which made him quite wealthy. The defendant owned numerous homes and luxury cars, and had a lavish social life. He has lived a life of advantage and privilege.

His crimes were certainly not motivated by need, and cannot be excused or mitigated by an imperfect understanding of the difference between right and wrong or lack of appropriate role models or opportunities in life. From the very beginning, the defendant clearly understood that his conduct was wrong, illegal, and carried serious consequences. Quite simply, he chose to

violate the law because he wanted to satisfy his own selfish desires, and avoid the consequences of those choices, and he thought he could get away with it because of his money, power, and influence.

Nor does the Government credit the defendant's expressions of remorse to Probation. (PSR ¶ 37). First, the defendant's conduct during the almost five years between Ms. Calo's death and his arrest in this case evinced no sign of remorse for her death or for his obstructive conduct. Second, the Government was recently contacted by an inmate at Rikers Island who was housed with the defendant in the last few months. The inmate was so troubled by some of the information conveyed to him by Hoey about the crimes in this case that he sought out a meeting with our Office; he sought no benefit for the information and acknowledged that he knew that our Office could not provide him a benefit in his pending state case in any event. He was interviewed by a federal agent and an investigator from our Office this week. In addition to confirming many of the details of the criminal conduct in this case (including information that has never been in the public record, as far as the Government is aware), the inmate indicated in that interview that Hoey expressed no remorse whatsoever for Ms. Calo's death, indeed laughing about it and telling other inmates, in substance, that he regretted that he hadn't been able to engage in further sexual conduct with her because of her death. The inmate also indicated that Hoey had talked about Ms. Zobkiw's tragic death in denigrating terms, stating in substance that "she got what she deserved." While the defendant may try to explain away these comments as mere jailhouse puffery, they are of a piece with his history of total disregard for the interests of anyone other than himself, and sharply undercut his expedient expressions of remorse in connection with his sentencing.

**B.**     **The Defendant's Federal Sentence Should Run Consecutive to the Defendant's State Sentence**

Title 18, United States Code, Section 3584(a) generally provides the district court with discretion to determine whether a sentence should run concurrently with or consecutively to a previously imposed sentence. *See* 18 U.S.C. § 3584(a) ("If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively."); *see generally Setser v. United States*, 132 S. Ct. 1463, 1468 (2012) ("Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings.").

Where a district court has the discretion to determine whether a sentence is consecutive or concurrent, United States Sentencing Guidelines ("U.S.S.G.") § 5G1.3 sets forth standards to apply in making this determination.  Section 5G1.3(a) specifies that a sentence should run consecutively to a previously imposed sentence when the instant offense was committed while the defendant was serving a term of imprisonment, or after sentencing for, but before commencing service of, a term of imprisonment. U.S.S.G. § 5G1.3(a).  Section 5G1.3(b) generally specifies that a sentence should run concurrently with a previously imposed, still-undischarged sentence when that previous sentence resulted from offenses that are relevant conduct to the instant offense of conviction.  U.S.S.G. § 5G1.3(b).   Section 5G1.3(c) generally specifies that a sentence should run concurrently with a state term of imprisonment that is anticipated to result from another offense that is relevant conduct to the instant offense.  None of these subsections apply to this case.

Section 5G1.3(d), which the Sentencing Commission has denominated a "Policy Statement," covers all other situations: "In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(d).   That guideline "generally vests broad discretion in the sentencing court," *United States v. Maria,* 186 F.3d 65, 71 (2d Cir.1999), and instructs district courts to consider a range of factors in deciding whether a sentence should run concurrently or consecutively to an existing sentence, including the 18 U.S.C. § 3553(a) factors, "the fact that the prior undischarged sentence may have been imposed in state court rather than federal court," and "any other circumstance relevant to the determination of an appropriate sentence," U.S.S.G. § 5G1.3 app. n. 4. *See United States v. McCormick,* 58 F.3d 874, 878 (2d Cir.1995) (noting that the court should "consider the basic principle that a consecutive sentence should be imposed to the extent that it will result in a reasonable incremental penalty") (internal quotation marks omitted).

Here, the defendant's previously imposed sentence resulted from his conviction in New York County Supreme Court in 2014 for misdemeanor assault and tampering with evidence, for which the defendant was sentenced to 1 and 1/3 years to 4 years in prison.  No provision in the Guidelines mandates that the sentence for the State Conviction run concurrent to this sentence. To the contrary, numerous factors counsel in favor of the sentences running consecutively.   The State Conviction related to the defendant's assault on his girlfriend in 2012, and his attempts to cover up that assault.  The instant offense occurred from 2005 until 2011, ending about a year before the defendant's arrest in the state.  The defendant's conduct in the state case is entirely unrelated to the narcotics and obstruction offenses he pled guilty to here, and his 2012 conduct

did not increase the offense level in this case. The federal and state convictions occurred at different times, in different places, and involved different participants (except for the defendant). Moreover, the state court judge who imposed the sentence was well-aware that the defendant was facing a significant federal sentence in this case. Indeed, the defendant's lawyers argued for a minimal sentence in the state case because Hoey was likely to serve a substantial federal prison term; those arguments were rejected by the state court judge, who imposed the maximum allowable sentence in that case – which at least suggests that the judge in the state case believed that the defendant should be sentenced, and punished, for each case separately, without credit for imprisonment imposed in the other case. Thus, because the 2012 conviction was entirely unrelated to the instant offense and not used to enhance the defendant's punishment here, the sentences should run consecutively. Otherwise, running the sentence for the instant offense concurrently with the state sentence would effectively reduce one or the other sentence, for no good reason.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a sentence above the applicable Guidelines range of 121 to 151 months' imprisonment is appropriate and just punishment, and is necessary to fulfill the purposes of sentencing as set forth in Section 3553(a).

Dated: New York, New York
March 27, 2015

Respectfully submitted,
PREET BHARARA
United States Attorney

By:    \_\_\_\_\_/s/_____
Margaret Garnett / Ian McGinley
Assistant United States Attorneys
Tel.: (212) 637-2520 / 2257